Slip Op. 13 - 146

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| WHEATLAND TUBE COMPANY, | : |
| Plaintiff, | : |
| and | : |
| UNITED STATES STEEL CORPORATION | : |
| Intervenor-Plaintiff, | : |
| v. | : Before: R. Kenton Musgrave, Senior Judge |
| UNITED STATES, | : Court No. 12-00189 |
| Defendant, | : |
| and | : |
| SeAH STEEL CORP., and HYUNDAI HYSCO, | : |
| Defendant-Intervenors. | : |

**OPINION AND ORDER**

[Remanding antidumping duty administrative review "major input rule" determination.]

Dated: December 4, 2013

   *Gilbert B. Kaplan*, *Daniel L. Schneiderman*, and *P. Lee Smith*, King & Spaulding LLP, of Washington DC, for the plaintiff.

   *Jeffrey D. Gerrish*, *Robert E. Lighthizer,* and *Ying Lin*, Skadden Arps Slate Meagher & Flom, LLP, of Washington DC, for the intervenor-plaintiff.

   *Ryan M. Majerus*, Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, argued for the defendant.  On the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant

Director.  Of Counsel was *David Richardson*, Attorney-International, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce.

 *Jeffrey M. Winton* and *Sung Eun Chang*, Law Office of Jeffrey M. Winton PLLC, of Washington DC, for defendant-intervenor SeAH Steel Corporation.

 *J. David Park*, *Phyllis L. Derrick*, *Jarrod M. Goldfeder*, and *Sally S. Laing*, Akin, Gump, Strauss, Hauer, & Feld, LLP, of Washington DC, for defendant-intervenor Hyundai HYSCO.

 Musgrave, Senior Judge:  The plaintiff Wheatland Tube Company challenges two determinations in *Circular Welded Non-Alloy Steel Pipe from the Republic of Korea*, 77 Fed. Reg. 34344 (June 11, 2012) ("*Final Results*"), *see* IAPDoc[1] 117, as articulated in the accompanying issues and decision memorandum dated June 4, 2012 ("I&D Memo"), IAPDoc 118.  Conducted by the International Trade Administration, U.S. Department of Commerce ("Commerce"), the *Final Results* are the eighteenth in the sequence of administrative reviews of entries of circular welded non-alloy steel pipe ("CWP") into the commerce of these United States ("U.S.") subject to the antidumping duty order thereon, and they address the period November 1, 2009 through October 31, 2010 ("POR").  The specific challenges are to the agency's decision not to seek additional information relating to the application of the major input rule with respect to SeAH Steel Corporation's ("SeAH") affiliate-supplier carbon steel input and the agency's decision to use shipment date as the date of the U.S. sales of Hyundai HYSCO ("HYSCO").  The major input rule determination requires remand but not the date of shipment determination.

---

[1] The defendant explains that the administrative record for the  consists of four parts, two public and two proprietary, because the review took place when Commerce was converting from a paper filing system to an electronic filing system.  The designation "IA" herein preceding the court's conventional citations to the public or confidential administrative record documents (PDoc or CDoc) are to those documents filed with IA Access, the Import Administration Antidumping and Countervailing Duty Centralized Electronic Service System.

*Jurisdiction and Standard of Review*

Jurisdiction is proper pursuant to 19 U.S.C. §1516a(a)(2)(B)(iii) and 28 U.S.C. §1581(c). Antidumping duty administrative review determinations, findings or conclusions are unlawful if "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. §1516a(b)(1)(B)(i).

*Discussion*

I. Collection of "Major Input Rule" Information

A. Background

In order to evaluate U.S. sales against comparison market sales, Commerce uses model match criteria established at the initial investigation to quantify the commercially significant properties of the product(s) under consideration. For the product at issue, CWP, the model match criteria encompassed (1) grade of pipe, (2) actual pipe size, (3) wall thickness, (4) surface finish, and (5) end finish. The criteria are intended to ensure proper price comparisons of comparable products. The defendant calls attention to the fact that the grade of carbon steel is not one of the criteria and avers that the investigation's model match criteria are adequate for matching CWP sold in the U.S. with sales of CWP in the Korean home market, and that it has used these criteria in all reviews subsequent to the investigation.

In the preceding administrative review, Commerce had found that the respondent SeAH had below-cost home market sales and thus excluded them from the dumping calculations, so for the instant review Commerce initiated a below-cost sales analysis consistent with its standard practice. *See* Preliminary Results (Dec. 5, 2011), IAPDoc 66, at 15. Being thus required to respond

Court No. 12-00189                                                                                                    Page 4

to Commerce's cost questionnaire, which directed SeAH to report its cost of production ("COP"), including all raw material inputs consumed, in a manner conforming with the model match criteria,[2] SeAH reported its carbon steel input costs on a CWP model-specific basis.[3]

        Commerce's "major input rule" practice, *see* 19 U.S.C. §1677b(f)(2) and (3), values affiliate-transferred major inputs at the higher of (1) the transfer price between the respondent and its affiliated supplier, (2) the market price between unaffiliated parties, or (3) the affiliated supplier's cost to produce the major input. In this instance, Commerce preliminarily examined SeAH's reported costs for inputs obtained via affiliation through separate major input rule applications to galvanized and non-galvanized carbon steel inputs, since these inputs have demonstrated differences in physical characteristics that carry over to the CWP products produced from each. *See* Preliminary COP Memo (Dec. 2, 2011), IAPDoc 63. For the galvanized carbon steel input, Commerce compared the average reported transfer price, SeAH's average purchase price for the input from unaffiliated suppliers, and SeAH's affiliate-supplier's cost to produce the input, and determined the affiliate transfer price to be highest. Commerce thus used the average affiliate transfer price for galvanized carbon steel in calculating the COP for SeAH's CWP. For the non-galvanized carbon steel input, Commerce utilized the same process and arrived at a similar result. *See id*.

---

   [2] *See* Commerce Ques. (Feb. 9, 2011), PDoc 22, Sec. D at D-1(I)(A) (Cost of Production), D-2(C) (Reporting Period of Cost of Production and Constructed Value) & (D) (Weighted Average Cost of Production and Constructed Value), frs. 101-102; D-2 through D-5 (II. General Information 5-8), frs. 102-105; D-10 through D-12 (III. Reporting Methodology), frs. 110-112; and D-16 through D-17 (Field Number 3.0 Direct Materials) frs. 116-117.

   [3] *See*, *e.g.*, SeAH's Ques. Resp. (Apr. 18, 2011), PDoc 39, Sec. D, at 9, and App'x D-4-D, PDoc 39, CDoc 6, frs. 480-481.

Following the preliminary results, Wheatland argued in its administrative case brief that Commerce should have required SeAH to report its carbon steel costs by grade of carbon steel. Wheatland's Administrative Case Brief (Mar. 15, 2012), IAPDoc 96, at 4-7. It also argued that Commerce had, without explanation, violated a practice of requesting steel costs on a grade-specific basis. *Id.* at 6-7. In addition, Wheatland alleged that an inventory report showed sufficient differences in the costs of carbon steel by grade to justify requesting the information. *Id.* at 4.

For the *Final Results*, Commerce explained that its major input rule practice does not include automatic request of information on steel cost by grade, and that it did not find the cases to which Wheatland cited established a practice of always requesting steel cost by grade:

> The facts in the instant case are distinguishable from those in the [*Stainless Steel*] case remand cited by Wheatland.[4] In this case, the major input is hot-rolled carbon-steel coils. We note that differences in grades for stainless steels are entirely different than for carbon steel. Stainless steels are alloy products of which the principal alloying element is chromium. However, a number of additional alloying elements can be added to obtain an assortment of performance characteristics. These additional alloying elements (nickel, molybdenum, *etc*.), in combination with chromium, can significantly affect cost. Carbon steels, which are used to make subject merchandise, do not contain alloy levels of elements and their performance is driven primarily by the level of carbon in the steel. For the subject pipe, there are slight differences in certain elements such as carbon for the different grades of the hot-rolled inputs. However, these differences are inconsequential, and there is a great level of interchangeability of hot-rolled inputs used to produce the different grades of pipe. Furthermore, although the CONNUM characteristics for circular welded non-alloy steel pipe include grade, this grade characteristic does not refer to the grade of the HRC, but rather the grade of the finished pipe (*i.e.*, pressure, ordinary standard, structural, or conduit).

---

[4] *See Final Results of Redetermination Pursuant to Court Remand, SeAH Steel v. United States*, Ct. No. 09-00248, ECF No. 63 (Sep. 17, 2010) ("*Remand Redetermination*"), at 27-28 (describing SeAH's June 11 and June 25, 2010 supplemental submissions). *Cf. SeAH Steel Corp. v. United States,* 35 CIT __, 764 F. Supp. 2d 1322 (2011) ("[i]n the *Remand Redetermination*, Commerce determined, based on additional information provided by Plaintiff, to consider steel specification as well as steel grade in applying the major input analysis").

> We also find Wheatland's reliance on *Coated Free Sheet Paper from Indonesia*[5] to be misplaced. In that case, the evidence on the record demonstrated that the pulp purchased from the respondents' unaffiliated suppliers was not comparable to the pulp purchased from the affiliated suppliers. However, in this case, as noted above, the differences between hot-rolled inputs are inconsequential, and there is a great level of interchangeability of hot-rolled inputs used to produce the different grades of pipe. The petitioner also cites to the current review of circular welded carbon steel pipes and tubes from Thailand (A-549-502), for which the final results have not been published since it is still ongoing. In the Thai pipe case, the respondent demonstrated that cost differences between different grades of hot-rolled inputs were so small as to be immaterial in terms of price, which supports the Department's position in this case.

I&D Memo at cmt. 8 (footnote omitted).

## B. Analysis

As indicated, Commerce does not have a practice of automatically separating inputs by grades of steel. It will, however, separate by grade upon a demonstration of significant physical or chemical differences justifying separate treatment, which involves "a fact-based analysis focused on whether there are physical [or chemical] differences in the major input that would justify subdividing that input into more than one category for analysis." *See* Def's Resp. at 29-30.[6] The plaintiff points out that in the aforementioned *Stainless Steel* case, for example, Commerce issued two rounds of supplemental questions to SeAH specifically geared to determining whether difference between stainless steel specifications warranted individualized treatment in the major input context.

---

[5] *Coated Free Sheet Paper from Indonesia*, 72 Fed. Reg. 60636 (Oct. 25, 2007) (final determ. of sales at less than fair value) (*Paper from India*") and accompanying issues and dec. mem. at cmt. 4.

[6] The defendant contends there is no dispute that the reference standard for conducting the major input analysis at the grade-specific level is whether "there are demonstrated differences in physical characteristics that may impact COP and final sales prices." *E.g.*, Def's Br. at 29, citing *Remand Redetermination*, as referenced in Pl's Br. at 8.

Commerce requested no similar level of specificity regarding carbon steel grades in the instant appeal,[7] justifying its decision not to collect further information relative to SeAH's inputs by reasoning "there are slight differences" and "a great level of interchangeability" among the hot-rolled inputs for producing CWP. Context does not indicate whether these are findings or opinions, but either instance must be supported by substantial evidence of record.

Wheatland argues that when comparing input prices from affiliated and unaffiliated suppliers, it is critical to ensure that the input purchases being compared are for the same product, and that whether differences among carbon steel grades are likely to be "less pronounced" than differences among stainless steel grades does not prove that carbon steel grade differences are not sufficiently large enough to "impact COP and final sales prices." Wheatland posits that the analysis can be distorted if purchases of a high-grade input from an affiliated supplier are compared to purchases of a low-grade input from an unaffiliated supplier: in that instance, any below-market transfer pricing for high grade material would be masked by the presence (and to that degree) of any

---

[7] The parties also present arguments over interpreting *Circular Welded Carbon Steel Pipes and Tubes From Thailand* (A-549-502) ("*CWP from Thailand*"), in which Commerce had solicited grade-specific carbon steel purchase information from respondent Saha Thai. *See*, *e.g.*, Pl's Br. at 10 and Ex. 1; Def's Resp. at 30-31. The defendant argues that the request for grade-specific information in that instance was not for application of the major input rule but because Saha Thai had claimed there was virtually no difference in the cost of the carbon steel consumed to produce all of its merchandise (subject and non-subject), and that the information requested was for settling how to allocate steel costs between subject and non-subject merchandise. The plaintiff points out that of the questions issued to Saha Thai, one solicited information regarding cost allocations, and the other solicited separate purchasing data for each grade of carbon steel Saha Thai obtained from its affiliated and unaffiliated suppliers, *see* Pl's Br. at Ex. 1, p. 16, and that the only purpose for requesting the latter information would be for examination of the major input rule on a grade-specific basis. The court need not address these contentions, because even if the government's understanding of *CWP from Thailand* were correct, it does not prove that the differences among the carbon grades at issue here are "inconsequential." Commerce did not solicit the information that would be necessary to such a determination from SeAH, but it did with respect to Saha Thai.

lower grade material used in the comparison as the market benchmark. The proposition is logical, but given Commerce's "practice" and the burdens it allocates, whether further examination of it was required is to be evaluated upon the substantiality of the evidence of record supporting the argument.

In the underlying proceeding, Wheatland pointed to a sample inventory ledger for a single month to argue that it showed relevant variations in inventory values among SeAH's carbon steel grades.[8] Wheatland claims the reference was to show the need for soliciting more complete data. *See* Pl's Reply at 5. The government and SeAH dispute the sample's significance, claiming it is insufficient to demonstrate "significant" differences among carbon steel grades, *see* Def's Br. at 32 and SeAH's Br. at 19-21, but it was not commented upon in the *Final Results* and cannot at this stage, *post facto*, justify rejection of Wheatland's argument for collecting the data "necessary to evaluating" SeAH's purchases of carbon steel on a grade-specific basis. *See* Pl's Reply at 6.

Although the inventory report is only for a single month, Wheatland claims it cited it because it was the only document on the record with any detail on the different grades purchased by SeAH. The report shows that at least for one month SeAH paid different prices (of arguable significance) for different steel grades. The government contends "Wheatland does not argue that these differences in the costs of steel inputs listed in the inventory report are attributable to any significant differences in physical characteristics among the inputs", Def's Br. at 32, but a fair reading of Wheatland's claim is that the inventory report does in fact indicate that different steel grades show significant cost differentials and therefore fairly detracts from Commerce's finding that

---

[8] *See* Comments on SeAH Second Supp. Sec. D Ques. Resp. (Oct. 21, 2011), IAPDoc 41, IACDoc 36, at 3-4, and Pre-Preliminary Comments Regarding SeAH Steel Corporation (Nov. 14, 2011), IAPDoc 57, IACDoc 69, at 4-6, citing SeAH's Supp. Sec. D Ques. Resp., PDoc 64, CDoc 17(July 25, 2011) at App. SD-6, p. 2.

"differences" (physical or otherwise) among grades are "inconsequential." Wheatland argues the inventory ledger at least should have led to more complete collection of information from SeAH regarding its purchases of specific steel grades from affiliated and unaffiliated suppliers.

In its reply brief, Wheatland points to examples of carbon steel grade comparisons of price-difference relevance[9] in the inventory ledger that are non-galvanized and were purchased in the same month (*i.e.*, November 2009), *see* Pl's Reply at 7, referencing SeAH's Supp. Sec. D Resp. (July 25, 2011), PDoc 64, CDoc 17, at App. SD-6, p. 2, and it argues that such price differences among hot-rolled coil grades may have had a not-insignificant impact upon the COP and price of the finished pipe products sold during the POR and obscured below-market transfer pricing. That remains to be seen, but this court, at least, is persuaded that Wheatland had raised a legitimate argument that has not been adequately examined or addressed in the *Final Results*. Being substantial evidence of record, the inventory ledger appears to detracts from Commerce's conclusion and thus calls into question the finding that differences among grades are "inconsequential." Because Commerce did not collect information regarding SeAH's purchases of individual carbon steel grades, the record does not reflect the full extent of any price differences among those grades upon which an "inconsequential" finding could be based.

---

[9] The primary objection raised by both the government and SeAH appears to be that the price differences between the two grades discussed in footnote 2 of the plaintiff's opening brief reflects differences between galvanized and non-galvanized products rather than differences among non-coated carbon steel grades, and SeAH further points out that the price difference in that example could reflect the possibility that the products may have been purchased at different times. *See* Def's Br. at 32; SeAH's Br. at 20-21. The court, however, regards that example as illustrative, not definitive.

Additionally stated in the *Final Results* in response to Wheatland's citation to *Paper from Indonesia* is that the grade of carbon steel is not a model match characteristic and thus is not reflected in the "CONNUM" for the finished pipe. I&D Memo at cmt 8 ("although the CONNUM characteristics for circular welded non-alloy steel pipe include grade, this grade characteristic does not refer to the grade of the HRC, but rather the grade of the finished pipe (*i.e.*, pressure, ordinary standard, structural, or conduit"). The CONNUM characteristic of the finished product, however, appears irrelevant on this issue. Wheatland explains, and the court understands, that its citation to *Paper from Indonesia* was intended as a counter-example, *i.e.*, a case where Commerce applied the major input analysis at a grade-specific level even though such grades were not reflected in the model match for the finished product. Wheatland contends that the major-input and transactions-disregarded analyses are "routinely" conducted for inputs that have no impact on the physical characteristics of the finished product, and it describes the example of a steelmaker who might obtain coal used as fuel from an affiliated supplier. The type of coal purchased would not directly affect the "physical" characteristics of the finished steel, but in order to determine whether and to what extent the steelmaker's reported costs are understated due to any non-arm's length pricing for the coal, it would be appropriate, assuming there are multiple grades of coal used in steel production, to compare transfer and market prices for the particular grade supplied by the affiliate, since the grade of coal can have a significant impact on its price,[10] and comparing the price of coking

---

[10] *Cf. Certain New Pneumatic Off-the-Road Tires from the People's Republic of China*, 77 Fed. Reg. 14495 (Mar. 12, 2012) (final administrative review results) and accompanying issues and dec. mem. at cmt. 4 (discussing the high degree of variability in values for different types of coal) with *Certain Hot-Rolled Flat-Rolled Carbon-Quality Steel Products from Brazil*, 64 Fed. Reg. 38756 (July 19, 1999) (final determination of sales at less than fair value) at cmt. 50 (applying the major input rule to coal input).

coal from an affiliated supplier to the price of steam coal from an unaffiliated supplier could distort the analysis and conceal non-arm's length pricing.

The point may be gilding the lily, but Wheatland has persuaded as to substantial evidence of record, to which it called Commerce's attention, that, unaddressed, in turn calls into question Commerce's finding that differences among SeAH's grades "are inconsequential," a decision that also appears to have been based upon the irrelevant factor of the way in which finished pipe CONNUMs are defined. Accordingly, the *Final Results* will be remanded for reconsideration. Upon remand, if Commerce deems it necessary to do so, Commerce may reopen the record and collect information needed to conduct the major input analysis at the grade-specific level for SeAH's purchases of carbon steel from its affiliated supplier, so long as its redetermination is reasonable.

II.  *Use of Shipment Date as the Date of HYSCO'S U.S. Sales*

A.  Background

The "date of sale" is defined not by statute but by the Statement of Administrative Action ("*SAA*") accompanying the Uruguay Round Agreements Act, *i.e.*, the "date when the material terms of sale are established." *SAA*, 103d Cong., H.R. Doc. 103-316 at 810 (1994), as reported in 1994 *U.S.C.C.A.N.* 4040, 4153. *See* 19 U.S.C. §1677b(a)(1)(A). The date the material terms of sale are "established" is normally the invoice date unless Commerce is "satisfied" that a different date better reflects the date on which those terms are established. *See* 19 C.F.R. § 351.401(i); *see also Nucor Corp. v. United States*, 33 CIT 207, 254, 612 F. Supp. 2d 1264, 1304 (2009) (invoice date is "only a 'rebuttable presumption'"). Commerce's practice is also to use the shipment date if it precedes the invoice date. *See, e.g., Stainless Steel Bar From Japan*, 65 Fed. Reg. 13717 (Mar. 14,

2000) (final antidumping duty administrative review results) and accompanying issues and dec. mem. at cmt 1.

In its questionnaire responses HYSCO reported "date of shipment" from its factory as the date on which the material terms for its U.S. sales were established, claiming, *inter alia*, that quantity, as a material term, can change up until the date of shipment from its factory. HYSCO Ques. Resp. Sec's B-D (Apr. 18, 2011), PDoc 40, at C-10, fr. 213; *see also* HYSCO Ques. Resp. Sec. A (Mar. 23, 2011), PDoc 33, at A-23, fr. 29. In supplemental questionnaire responses, HYSCO repeated that "material terms of sale can and do change after the initial agreement with the customer" in part because "quantity can change up until shipment from HYSCO's factory" and because "price can change up until HYSCO issues its tax and commercial invoices, which are typically issued" at the end of the month in which the merchandise is shipped, HYSCO Supp. Ques. Resp. (Sep. 9, 2011), IAPDoc 18, at S-4, fr.10, and S-26, fr. 32. HYSCO averred that the price does not change after the shipment date and that with each of its orders there is a quantity tolerance of plus or minus 10 percent, or up to 20 percent depending upon the contract, that is enforced on a "line-item basis" such that quantity is not "established" until the date of shipment.

Commerce relied on this claim for the preliminary review results, *i.e.*, the date of shipment is the date of HYSCO's U.S. sales. In response to a supplemental questionnaire requesting explanation and documentation on the transactions for which the material terms of sale had changed after the purchase order date, HYSCO elaborated that "[e]ach line item represents a unique product of which HYSCO's customer has ordered multiple pieces" and that "[t]hese individual line items

are [the] individual orders in and of themselves"[11], and it provided a list of all sales on a line-item basis that had changed in quantity above or below the contractual tolerances. HYSCO Third Supp. Ques. Resp. (Feb. 22, 2012), IAPDoc 88, IACDocs 93-101. It also included supporting sales documentation as well as a list of all sales on a line-item basis that were within the contractual tolerances. *Id*. at Ex. 7A (list), IACDoc 95, fr. 37; IACDocs 93-99, Ex. 7B (supporting sales documentation). HYSCO explained that its order system "would not permit" shipping merchandise quantities of less than or in excess of the 10 percent quantity tolerance -- considered on a line-item basis -- without first contacting the customer. IACDoc 95, at 1-4, fr. 7-10. HYSCO also submitted customer and sales personnel declarations that the quantity tolerance was on a line-item basis. *Id*. at 1-10, fr's 7-16. HYSCO explained that if the tolerances were applied on a total order basis, rather than a line-item basis, customers could contractually end up with excess quantities on some line items and insufficient quantities of other line items, which could hinder their ability to meet project needs. *Id*. at 2, fr. 8.

　　　　In their administrative case briefs, Wheatland and U.S. Steel Corporation argued that the record did not support a finding that HYSCO applied quantity tolerances on a line-item basis. Specifically, they argued that the material terms of HYSCO's sales were set on, and did not change after, the purchase order date, because language in the offer sheets pertains to "total amount and quantity," which is a "total order" basis, not a "line-item basis," because HYSCO failed to provide a single negotiation document that references a "line-item quantity tolerance change," and because, although HYSCO provided "examples" demonstrating sales quantities for certain for certain

---

[11] HYSCO Third Supp. Ques, Resp. (Feb. 22, 2012), IAPDoc 88, at 1, fr. 7.

transactions, the "outside line item quantity tolerance" changes were infrequent and HYSCO failed to provide a single correspondence granting permission to make these material changes to sales in any event. Rather, the petitioners contended, the total quantity ordered and the total quantity actually shipped were well within the contractually specified quantity tolerance listed in HYSCO's written order and contract documents. *See* IAPDoc 96, at 1-22; *see also* U.S. Steel's Administrative Case Brief (Mar. 15, 2012), IAPDoc 95, at 1-11. HYSCO's rebuttal brief argued that record evidence demonstrated that the quantity of the sales did change on a line-item basis in excess of the contractual tolerances. In support of this position, HYSCO discussed the terms and conditions of HYSCO's sales, the nature of its order system, and various declarations provided by customers and sales personnel. *See* HYSCO's Rebuttal Brief (Mar. 22, 2012), IAPDoc 109, at 13-33.

　　　　　For the *Final Results*, Commerce continued to use HYSCO's shipment date as the date of sale for HYSCO's U.S. sales. Commerce found that the orders with the unaffiliated customers did not show whether the 10 percent quality tolerance was on a line-item or total order basis, and it recognized that the quantity tolerance identified in certain sales documents refer to the total quantity and amount, but it determined that "the company intends that to mean total quantity of each line item." Additional record evidence Commerce found demonstrating that HYSCO applied the 10 percent tolerance via its accounting system on a line-item basis and that HYSCO can and does change that tolerance on a line-item basis, and Commerce accepted that HYSCO had provided examples of the changes to quantities on a line-item basis and had also provided relevant internal communications between HYSCO and its affiliate seeking approval of a change in excess of the tolerances on a line-item basis. Addressing the petitioners' argument that in prior reviews the

purchase order date had been used rather than the shipment date, Commerce stated that the date of sale determination depends on the specific facts before it in each review, and it disposed of the argument that the infrequent number of sales affected by changes in quantity made the changes immaterial on the basis that the argument was "outdated." *See* I&D Memo at cmt. 2.

B.  Analysis

The date the material terms of sale are "established" is determined based on the record as a whole as reasonably construed. *See*, *e.g.*, *Sahaviriya Steel Indus. Pub. Co. v. United States*, 34 CIT ___, ___, 714 F. Supp. 2d 1263, 1281 (2010). As Commerce implied above, a single sale with a subsequently-changed material term may, depending upon the record as a whole, be deemed sufficient for determining the date of sale as other than the date of invoice. *See Allied Tube & Conduit Corp. v. United States*, 25 CIT 23, 27, 132 F. Supp. 2d 1087, 1092 (2001).

Wheatland points out the defendant and HYSCO point to only three pieces on the record to justify Commerce's determination, but none of these, Wheatland contends, amounts to "substantial" evidence: (1) the single referenced e-mail does not relate to any specific POR transaction, (2) HYSCO's internal accounting system does not demonstrate contractual agreement to line-item tolerances, and (3) the certain declarations of sales personnel and unaffiliated customers are not referenced in the *Final Results*. Pl's Reply at 10-13, referencing *Hoogovens Staal BV v. United States*, 24 CIT 44, 60, 86 F. Supp. 2d 1317, 1331 (2000) (the court "must evaluate the validity of an agency decision on the basis of the reasoning presented in the decision itself").

The problem with Wheatland's argument is that it does not, in fact, address the "totality" of information Commerce mustered in support of its determination. Wheatland effectively

asks the court to reweigh or reinterpret select aspects of the record, but given the standard of judicial review, the court must decline, as those are matters within Commerce's discretion. Commerce had to interpret the record as a whole to determine when the material terms of sale were established, and it concluded thhat the issue resolved to whether the quantity tolerances were on a total-order or line-item basis. Commerce was "satisfied", *see* 19 C.F.R. § 351.401(i), that the evidence of record demonstrated the latter:

> The record evidence shows the material terms of sale can and do change up until shipment date. . . . [W]e have examined other information on the record regarding the delivery tolerance. Specifically, HYSCO has shown that when it codes each sale into its accounting system, it codes the quantity tolerance next to each line item. HYSCO has shown how it can and does change the tolerance for specific line items within the order. In addition, HYSCO has claimed that even though the internal offer sheets refer to total quantity, the company intends that to mean total quantity of each line item. Indeed, HYSCO has provided us with communications between it and its affiliate seeking approval to ship more than the tolerance amount for a specific line item on a specific invoice.

I&D Memo at cmt 2.

On this record, the court cannot conclude such articulated "satisfaction" unreasonable.

*Conclusion*

The first issue is hereby is remanded for reconsideration in accordance with the foregoing, and the results thereof shall be due March 7, 2014, comments thereon by April 7, 2014, and rebuttal by April 30, 2014.

**So ordered**.

/s/  R. Kenton Musgrave
R. Kenton Musgrave, Senior Judge

Dated: December 4, 2013
New York, New York